UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

In re:

Veblen West Dairy, LLP,

Chapter 11
Case No. 10-10071

Debtor.

## AGSTAR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPOINTMENT OF OPERATING TRUSTEE

### I. INTRODUCTION

AgStar Financial Services, FLCA and AgStar Financial Services, PCA (collectively "AgStar"), submit this Memorandum of Law in support of their motion for appointment of an operating trustee in this matter pursuant to 11 U.S.C. § 1104, and as requested by the Court at the conclusion of the evidentiary hearing begun on May 10, 2010, and concluded on May 25, 2010.

Veblen West Dairy, LLP ("Veblen West"), filed a Petition for Bankruptcy under Chapter 11 of the Bankruptcy Code on April 7, 2010. The Petition was signed by Richard Millner ("Millner") as General Partner of Veblen West. At the time of the Petition, and currently, Veblen West was managed and operated by Prairie Ridge Management, LLP ("PRM"), pursuant to a Management Agreement dated April 21, 2008. (Exhibit D20). Millner owns 92% of PRM, and is its Chief Executive Officer. (May 10, 2010 Hearing Transcript, at pages 7-8).

Veblen West's Bankruptcy Schedule D lists AgStar as a secured creditor with a total claim of $18,619,410.72. (Exhibit AG11, Schedule D). In addition, Dairy Dozen-Milnor's ("DD-Milnor") Schedule D lists AgStar as a secured creditor with a total claim of $6,196,940.41 (Exhibit AG12, Schedule D). Dairy Dozen-Thief River Falls' ("DD-TRF") Schedule D lists AgStar as a secured creditor with a total secured claim of $3,397,258.83. (Exhibit AG13, page

12).[1]  AgStar is also the first secured creditor of Veblen East.  (May 10, 2010 Hearing Transcript, at page 192).

In addition to its outstanding indebtedness, AgStar's loans to these four entities are also secured in part by personal guarantees from the so-called Dairy Dozen Investors (described below and including Rick Millner, Michael Wyum, and PRM), and others, in the amount of $16,328,509.10.  (Exhibit..\BRIEF AG1).

## II.  APPLICABLE LAW

Section 1104 of the Bankruptcy Code provides for the following regarding appointment of an operating trustee in a case filed under Chapter 11 of Bankruptcy Code:

> (a) at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

While the "default" position is that current management retains control of the debtor company in a Chapter 11 case, § 1104 "represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  "The decision whether

---

[1] As described more-fully below, DD-Milnor and DD-TRF are Debtor's related entities, also under the management of PRM/Millner.  DD-TRF and DD-Milnor also filed Bankruptcy Petitions under Chapter 11 on April 7, 2010; DD-TRF in the United States Bankruptcy Court for the District of Minnesota (Case No. 10-60438 DDO), and DD-Milnor in the United States Bankruptcy Court for the District of North Dakota (Case No. 10-30377).  (Exhibits AG 12 and AG13).  Both of these Petitions were also signed by Rick Millner, as the managing partner of those respective entities.

to appoint a trustee is fact intensive and the determination must be made on a case by case basis." *In re Sundale, Ltd.*, 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009). Pre-petition activity of management is considered as part of a § 1104 determination. *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988).

Ordinarily, a debtor-in-possession has all the rights and powers, and shall perform all the functions and duties of a trustee. 11 U.S.C. § 1107. "Chief among these [duties] … is that the debtor in possession is a *fiduciary* to all of its creditors and equity security holders." *In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). Fiduciary obligations include the "duty of loyalty and good faith [which] forbids directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position." *In re Microwave Products of America, Inc.*, 102 B.R. 666, 672 (Bankr. W.D. Tenn. 1989). "To fulfill its duty of loyalty, a debtor-in-possession must avoid self-dealing, conflicts of interest and the appearance of impropriety." *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (internal quotations omitted).

Consequently, questionable business transactions with related companies may serve as grounds for appointment of trustee. *Tradex Corp. v. Morse*, 339 B.R. 823, 835 (D. Mass. 2006); *see also Oklahoma Refining*, 838 F.2d at 1136 ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require.") (*citing* cases). One court has identified a non-exclusive list of factors to consider in determining whether to appoint a § 1104 trustee under subsection (a)(1), including:

- Materiality of misconduct;

- Evenhandedness or lack thereof in dealing with insiders and affiliated entities in relation to other creditors or customers;

- The existence of prepetition voidable preferences or fraudulent transfers;

- Unwillingness or inability of management to pursue estate causes of action;

- Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and

- Self dealing by management or waste or squandering of corporate assets.

*In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000); *see also In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005).

Once a party seeking a trustee meets its burden under Section 1104, the Court "shall" appoint a trustee. *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004); *In re Oklahoma Refining Co.*, 838 F.2d at 1136 ("[o]nce the court has found that cause exists under § 1104, it has no discretion but must appoint a trustee."). "It is clear, both from the language of the statute and established case law, that the court need not find any of the enumerated wrongs [in § 1104(a)(1)] in order to find cause for appointing a trustee. It is sufficient that the appointment be in the interest of creditors." *Id.* at 1136 (citation omitted). While any one issue may not warrant appointment of trustee, the Court may consider the cumulative or collective impact of the alleged problems or issues in making its decisions. *In re Cardinal Indus., Inc.*, 109 B.R. 755 (Bankr. S.D. Ohio 1990).

As compared to subsection (a)(1), under which appointment of an operating trustee is mandatory if the requisite showing has been made, "[s]ubsection (a)(2) creates a flexible standard which allows for appointment of a trustee, even though "cause" may not exist when so

doing would serve the interest of creditors and the estate. Factors which justify appointment of a trustee under this subsection are highly diverse and in essence reflect the practical reality that a trustee is needed to manage the debtor's affairs." *Id.* Section 1104(a)(2) "may well, entail the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis . . . ." *In re SunCruz Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003). "Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists." *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007). Factors identified in considering whether to appoint a trustee under § 1104(a)(2) include: (1) the trustworthiness of the debtor; (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence—or lack thereof—of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee, balanced against the cost of appointment. *Id.* at 427 (*quoting In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)). The level of acrimony between the debtor-in-possession and the creditors, standing alone, can form the basis to appoint a chapter 11 trustee under § 1104(a)(2). *Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3rd Cir. 1998) ("The level of acrimony found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate.").[2]

---

[2] The text of 11 U.S.C. § 1104 does not prescribe the standard of proof that must be met before a Chapter 11 Trustee is appointed. When a bankruptcy code provision is silent with regard to the appropriate burden of proof, that "silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *See Grogan v. Garner*, 498 US 279, 286 (1991). In *Grogan*, the Debtor argued that the appropriate burden of proof regarding discharge exceptions under 11 U.S.C. § 523 was clear and convincing evidence. (Id.) The United States Supreme Court disagreed because 11 U.S.C. § 523 did not prescribe that higher burden. 11 U.S.C. § 1104 is equally silent on the issue of the appropriate burden of proof. The Third and Fifth Circuit Courts of Appeals have since adopted the "clear and convincing evidence" standard, even after *Grogan*. *See, e.g., In re Marvel Entm't Group, Inc.*, 140 F.3d at 471; *In re Cajun Elect. Power Coop, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995). However, these subsequent decisions did not even discuss *Grogan* or otherwise attempt to distinguish its rule of law, suggesting that the issue was not properly presented. Those courts that have specifically addressed *Grogan* have instead noted that the preponderance standard either is or may be more appropriate. *See, e.g., Tradex Corp.*, 339 B.R. at 835; *In re Altman*, 230 B.R. 6, 6-17 (Bankr. D. Conn. 1999), *vacated in part on other grounds by* 254 B.R. 509 (D. Conn. 2000)

# III. ANALYSIS

The application of the law set forth in Section II above to the facts of this case is best organized according to the non-exclusive list of factors identified by the Court in *In re Intercat, Inc.*, 247 B.R. at 921. The compelling facts AgStar presented during the hearing establish cause pursuant to § 1104(a)(1), or in the alternative, establish that the Court should exercise its equitable powers to appoint an operating trustee pursuant to § 1104(a)(2). *See In re Eichorn*, 5 B.R. 755, 758 (Bankr. D. Mass. 1980) ("Congress ... has given the Bankruptcy Court the flexibility under Section 1104, subsection (a)(2), to allow the court to utilize its broad equity powers in determining whether the appointment of a trustee would be in the best interests of creditors, equity security holders and other interests of the estate.").

Whether the Court applies either the "for cause" standard under § 1104(a)(1) or the flexible equity standard under § 1104(a)(2), the following facts are significant throughout: (1) PRM managed and controlled all of the Dairies, and continues to do so for all of the Dairies except Veblen East; (2) Millner controls PRM, and is the Managing Partner for all of the Dairies except Veblen West as of May 10, 2010; (3) Millner has a significant equity stake in all of the Dairies, with the exception of Veblen East; (4) only Veblen East, Veblen West, DD-TRF, and DD-Milnor are borrowers of AgStar; (5) Michael Wyum was part of and aware of Millner's self-dealing, preferential transfers, and fraudulent conveyances and, like Millner, has conflicts arising from both his equity interests in and guarantees of the other Dairies; (6) significant account and cash transactions occurred continuously among the Dairies as directed by Millner and PRM, many of which were not consistent with or explained by the integrated production model described below; and (7) many of these entities have or recently had significant accounts or notes payable

---

In the absence of a clear ruling from the Eighth Circuit Court of Appeals or Eighth Circuit Bankruptcy Appellate Panel, the Court should follow the rule of law articulated in *Grogan* and apply a preponderance of evidence standard here because the Bankruptcy Code provision at issue is silent with regard to the appropriate burden of proof..

or receivable with PRM, their own equity stakeholders, and the other Dairies in the system. Against these facts, this Memorandum now turns to the specific factors identified by the Courts in determining whether an operating trustee is appropriate under the facts presented here.

**A. The compelling evidence AgStar presented reveals that Millner's/PRM's conduct requires the appointment of a disinterested Trustee**

AgStar presented abundant testimony and documentary evidence demonstrating that Millner has used PRM's management power to engineer preferential transfers and fraudulent conveyances, and has engaged in self-dealing. These transactions favored Millner, PRM, some of Veblen West's affiliated entities, and Millner's favored insiders, while irreparably harming Veblen West and its associated entity, Veblen East. AgStar also presented overwhelming evidence that Veblen West's management simply has too many interlocking fiduciary obligations to be expected, even with the best of intentions, to pursue claims regarding these dubious transactions. AgStar's evidence implicates each and every factor warranting appointment of an independent trustee.

**1.     Millner devised a number of preferential and fraudulent transactions to benefit himself, insiders, and certain entities, while saddling Veblen West and Veblen East with the negative consequences of those moves.**

As noted above, "questionable business transactions with related companies may also serve as grounds for appointment of a trustee." *Tradex Corp.*, 339 B.R. at 835 (citing *Oklahoma Refining*, 838 F.2d at 1136); *see also In re Sharon Steel Corporation*, 871 F.2d at 1217. Millner has consistently shown a willingness to risk the assets of Veblen West and other affiliated entities for his own benefit, and for the benefit of favored insiders, including transactions on the eve of bankruptcy.

### a. The Vantage Loan Agreement with Choice Financial placed Veblen West's and other entities' assets at risk for Millner's personal benefit.

Millner used his management power over Veblen West and its related entities through PRM to engineer a number of self-serving transactions. For instance, on January 22, 2010, one of Veblen West's related entities Vantage Cattle Company, LLP ("Vantage"), and its owners entered into a "2010 Loan Agreement" with Choice Financial, Vantage's principal lender, to obtain a forbearance on $6.659 Million of outstanding debt. (Exhibit AG23, pages 29–55). Millner signed the 2010 Loan Agreement on behalf of all 11 different entities, including Vantage itself, Veblen West, and all of the other Dairies. (*Id.*, pages 45-46). In addition, each of the Dairy Dozen investors,[3] including Rick Millner and Michael Wyum, separately guaranteed the Vantage debt with Choice Financial for up to $1.1 Million per guarantor. (*Id.*, pages 34-35). Among other things, a condition precedent to the 2010 Loan Agreement was a requirement that Vantage pay Choice Financial "a principal payment of $495,000.00 to pay off a loan to Guarantors **Richard Millner** and Wayne Viessman" (*Id.*) (emphasis added).[4]

As security for the Vantage Loan, Millner agreed on behalf of all of the entities (including Veblen West) to provide a security interest in all of the entities' deposit accounts with Choice Financial. (Exhibit AG31). The Agreements are all dated January 20, 2010, and provided that each such deposit account would secure payment of "**all present and future debts,** of every kind and description which: VANTAGE CATTLE COMPANY, LLP may not or hereafter owe to [Choice Financial], no matter how or when these debts arise." (*See, e.g.* Exhibit AG31, page

---

[3] The term "Dairy Dozen" appears to refer to a group of investors all of whom have a significant ownership interest in most of the Dairies and DD-Veblen, which appears to consist of the following persons: Aaron Anderson; Duayne Baldwin; Jay Hill; Jorden Hill; Richard Millner; Dennis Pherson Jr.; Lenny Pherson; Doug Viessman; Wayne Viessman; Randy Viessman; Terry Viessman; and Michael Wyum. (*See* Exhibit AG2).

[4] At the May 10 evidentiary hearing, Millner inconsistently denied that PRM had "ever used funds for any of those people that it manages funds for to pay off any personal obligations." (May 10, 2010, Hearing Transcript, at page 12).

13 (Veblen West Assignment of Deposit Account) (emphasis added)).   As part of that Agreement, Rick Millner as Managing Partner of Veblen West, "represent[ed] and promise[d] that no other person or entity has any rights in the collateral that have priority over those [Veblen West is giving Choice Financial] here...." (*Id.*).   Millner admitted on examination that this representation regarding Veblen West was false, because the funds in Veblen West's Choice Financial account would primarily represent proceeds from milk and cattle sales, all of which would be subject to AgStar's first priority security interest.   (May 25, 2010, Millner Transcript, at page 59).

Millner also executed a Deposit Control Agreement in favor of Choice Financial for each of Veblen West's related entities.   (*See, e.g.,* Exhibit AG31, page 14 (Veblen West Deposit Control Agreement)).   Millner claims that these Deposit Control Agreements were "in the best interest of each one of these entities – to have an agreement that if we – if they weren't able to pay, that there could be consequences, just to keep the cattle coming."   (May 25, 2010, Millner Transcript, at page 55).   However, none of the other entities owed any debts to Choice Financial at the time.   (*Id.*, pages 55-56).

Choice Financial apparently exercised its supposed rights under the Assignment of Deposit Accounts on March 19, 2010, withdrawing $122,709.29 from Veblen West's account, which after PRM made various deposits to bring Vantage's note current, Choice Financial re-deposited back into Veblen West's account on March 23, 2010.   (Exhibit AG27, pages 7 & 6; *see also* May 25, 2010 Millner Transcript, at page 65 (Mr. Millner acknowledging that Choice Financial swept all of the entities' accounts at sometime in 2010)).   Millner claims that Choice Financial called its Vantage loans due because "the receiver [for Veblen East] informed the bank that they weren't going to pay for cattle that came from Vantage."   (May 25, 2010, Millner Transcript, at page 37).   However, Millner must have been confused about the timing of these

events; Veblen East's receiver did not give notice of its intent to terminate the Vantage contract until March 26, 2010. (May 25, 2010 Hearing Transcript, at page 87).

In short, Millner used his management power over all of these entities to engineer a transaction whereby his own guarantee of obligations to Vantage would be paid off, while risking the assets of other related entities.

### b. Millner orchestrated an assignment of non-accruing, aged, insider notes payable from Veblen East to Veblen West & Vantage on the eve of bankruptcy.

Next, Millner engineered additional transactions to benefit himself and other insiders at Veblen East's expense. On February 22, 2010, as managing partner on behalf of Veblen West, Millner entered into three "Purchase Agreements" with various parties, most of whom were either the "Dairy Dozen" insiders or entities affiliated with those insiders. (Exhibits AG3, AG4, & AG5). These Purchase Agreements purported to transfer $4,639,568.76 of notes and accounts payable owed by Veblen East to Veblen West (Exhibit AG5), and $2,610,948.46 owed by Veblen East to Vantage (Exhibits AG3 & AG4).[5] As to Veblen West's assignment, these payables included $1,181,700.95 allegedly owed by Veblen East to PRM; $357,605.47 owed to DD-Milnor; $855,000.00 owed to Vantage; $78,555.72 owed to Millner Farms; $362,736.49 owed to New Horizon; $43,618.00 owed to Shortfoot; and $70,019.29 owed to Michael Wyum (Exhibit AG5, page 31). The various transactions effectuating these transfers were entered into PRM's QuickBooks accounting software on February 22, 2010, but were backdated for an effective date of January 31, 2010.

These accounts were non-accruing, unsecured, and aged. Notably, Veblen East was not even a party to any of these agreements, and there is no formal action appearing that Veblen East consented to these transfers; although Millner did execute the assignments in his capacity as

---

[5] Millner indicated that he had done this on the recommendation of counsel, apparently Leonard Street. (May 10, 2010, Hearing Transcript at 56-57).

either Managing Partner or President of Vantage/Veblen West, the assignee, and on behalf of DD-Milnor; DD-TRF; himself personally; New Horizon Dairy, LLP ("New Horizon"); the Bull Pen; PRM; and Vantage as Assignors. (*See* Exhibit AG4, page 7 & 21; Exhibit AG5, pages 4-9). In exchange for these assignments, PRM cancelled an equivalent amount of receivables owed by Vantage and Veblen West to Veblen East.  (Exhibit AG23, page 60 (Vantage); Exhibit AG25, page 1 (Veblen West); May 25, 2010 Millner Transcript, at page 34).  As to Veblen West, the QuickBooks Customer Detail Report shows that the Veblen East receivable represented accrued advances by Veblen East for Veblen West's current operating expenses, including feed, employee wages, and fresh cows. (*Id.*)  This Exhibit directly contradicts Mr. Millner's testimony that "[i]t was offset against debt that wasn't being readily paid either.  So it was very – it was a – it was the exact same class and the money came from the same source in the first place."  (May 10, 2010 Hearing Transcript, at page 56.).  As to Vantage, the Veblen East receivable reflected current cash advances as pre-payments for heifers that had not yet been delivered, and presumably as a result of this Assignment, never will be delivered. (*See* Exhibit AG23, page 57-58).

In short, PRM had Veblen East transfer non-accruing, insider, aged debt in exchange for an offset of receivables representing current cash advances made by Veblen East to sustain Veblen West's and Vantage's operations.  This occurred despite the fact that (1) Veblen East was insolvent at the time; (2) Veblen East was in default of its loan obligations to its senior secured creditors; (3) Veblen East and Veblen West had different ownership, with the Korean Investors holding $16.0 Million of equity in Veblen East and none in Veblen West (*see* Exhibit AG2); (4) Veblen East and Vantage had different ownership, with Vantage consisting entirely of the "Dairy Dozen" insiders; and (5) Veblen East had significant cash requirements and was already unable to meet its current cash requirements before the transfer.  However, according to Mr. Millner,

these transfers were "business as usual." (May 10, 2010 Hearing Transcript, at page 58.). In reality, these transfers "reduced [Veblen East's] current accounts receivable, which they were relying on to obtain cash from Veblen West so that they could turn around and pay their bills." (*Id.*, page 180 (testimony of Glen Steiner)). In other words, these transactions helped insiders, but deeply wounded Veblen East financially.

As to Veblen West's assignments, Veblen West issued notes payable to these insiders for the payables assumed by Veblen West. (Exhibit AG23, pages 66-68). Tellingly, of the notes payable transferred, none of them have been paid except for payment to New Horizon of $36,400.33 on February 28, 2010 (Exhibit AG23, page 67),[6] and the entirety of the Vantage note payable as described in more detail below.

These transactions were also unprecedented. Millner claims that these Assignments were done in the ordinary course of business and that "what we had done previous in a situation like that, the partners never – you know, in putting all this money in, didn't want it all sitting in one entity. And so we would actually do it by swapping checks and truing things up. In this particular case, we had a lot of issues with closing, and we didn't get at it, so it was done in February." (May 25, 2010 Millner Transcript, at page 31). In fact, however, such an assignment involving the moving of specific accounts payable owed to specific creditors (all insiders) had never been done in the past, and this was not done in the ordinary course of business. (*See* May 25, 2010, Millner Transcript, at page 36 (Mr. Millner acknowledging that prior to this point in time, PRM had not done any assignments like this for any of the entities)). The "check swapping" Millner is referring to was solely between the entities themselves, and always involved significantly lower dollars than were involved in the February 22, 2010 Assignments.

---

[6] New Horizon is one of the Milking Dairies, is owned by the Dairy Dozen insiders, and apparently owes money only to Viessman Trucking and Kelly Nichols, both owners of New Horizon itself. (May 10, 2010 Hearing Transcript, at page 62; Exhibit AG21, page 5 (listing Notes Payable to Partners of New Horizon, including Wayne Viessman and Kelly Nichols)).

(*See, e.g.,* Exhibit AG27, pages 2 & 4 (entries for January 31, 2010 and February 28, 2010, showing transfers on January 31 between Veblen East and Veblen West of virtually identical $592,000 payments, and on February 28 of exchanges between Dairy Dozen Veblen and Veblen West of $1,359.66; New Horizon and Veblen West of $36,400.33; and Veblen East and Veblen West of $29,533.19)). None of these exchanges ever involved the specific assignment of specific creditors' notes payable from one entity to another, and never in the amounts transferred by the February 22, 2010 Assignments. Thus, Millner engineered another dubious transaction in favor of insiders, while placing Veblen East in a cash-crunch.

### c. Millner caused Veblen West to make a number of insider-friendly payments from its Choice Financial Account

Soon after these unprecedented and insider-favorable transfers, Millner began funneling money from Veblen West to insiders and other entities. Following the February 22, 2010, Assignments, on February 28, 2010, PRM had Veblen West pay Vantage $99,656.18 from Veblen West's checking account with Choice Financial.[7] (Exhibit 27, pages 1 & 7). At the time, according to PRM's internal records, Veblen West's checking account was overdrawn by $54,964.84, and this payment increased that overdraft status to $154,621.04. (*Id.*, page 1) The next day, however, Veblen West received a milk check from Bongard's Creameries for $550,468.24. (*Id.*, pages 1 & 6). This deposit left a net balance in the Choice Financial account of $403,825.87. (*Id.*, page 1). PRM immediately had Veblen West pay Vantage another $395,000 out of this account, leaving a balance of $8,825.87 in Veblen West's Account. (*Id.*, page 1 & 7). Thus, in two days, PRM caused Veblen West to pay Vantage $494,656.18, at a time when Veblen West was insolvent, and Vantage was, at most, an unsecured creditor with a

---

[7] Prior to February 28, 2010, Debtor had little to nothing directly to do with Vantage, and no payments of any kind from Debtor to Vantage appear in PRM's Bank Activity QuickBooks reports from September 1, 2009 – February 27, 2010.

dated note payable, but an entity with many of the same owners as the other Dairies, including Millner himself.

Vantage's Choice Financial records show that this money was used to make a payment on Vantage's loan with Choice Financial of $131,380.98; to pay Shortfoot $125,000; and to pay Lunderby's (who apparently provides custom raising for Vantage), $150,000. (Exhibit AG23, pages 1 & 4).

After the approximately $495,000 of transfers from Veblen West to Vantage on March 1, 2010, Veblen West had various relatively small deposits and wrote several checks throughout March, which eventually caused Veblen West's checking account to have a negative balance of $54,214.04 as of March 18, 2010.[8] (Exhibit AG27, pages 5 & 6). On that date, Veblen West received another Bongard's milk check for $552,418.67, leaving a net balance of $498,204.63. PRM took that money and paid a utility bill to Elanco, and $430,000 to Vantage, leaving a net balance in the account of $9,588.21. (*Id.*, pages 5 & 7). This $430,000 payment was supposedly payment on Vantage's behalf for some debt Vantage allegedly owed to Greg Louwagie; PRM's QuickBooks transaction entry states "[m]ost all should be returned 3/19/10 or 3/22/10." No monies were received from either Vantage or Greg Louwagie on March 19th or March 22nd. That same day, March 18th, PRM also had DD-Milnor (Five Star) wire Vantage $120,000 as a "temporary wire" in addition to the monies that Vantage had received from Veblen West. (Exhibit AG23, page 73).

These payments were supposedly made by Veblen West to Vantage in satisfaction of the $855,000 note payable transferred to Veblen West from Veblen East as part of the February 22, 2010 Assignment described above. In fact, however, the four transfers described above actually

---

[8] Among these smaller payments, were payments by Debtor to Vantage of $4,350 on March 4, 2010, which was the exact same amount deposited that day into Debtor's account as a payment on an account receivable owed by New Horizon to Debtor. (Exhibit AG27, page 4).

14

resulted in Vantage having been "overpaid" by Veblen West by $74,006.18. On March 24, 2010, according to PRM's QuickBooks records, Vantage "re-paid" Veblen West $63,000; meaning that as of that time, Vantage still owed Veblen West $11,006.18 (Exhibit AG27, page 5; Exhibit AG23, page 67).

On April 1, 2010, according to the First Savings Bank records, PRM caused Veblen West to wire Vantage another $200,000, despite the fact that as of this time, there was a negative balance on the note payable to Vantage, and the fact that under the integrated production model, Veblen West and Vantage would and did have no direct business relationship. (Exhibit AG28, page 2). Thus, from February 28, 2010, through April 1, 2010, basically one month prior to bankruptcy, PRM had Veblen West pay Vantage, an entity owned by Millner and other insiders of the Dairies and, at most, an unsecured creditor of Veblen West, over $1.06 Million, or more than $200,000 more than it was actually owed according to PRM's own internal records, and constituting almost all of the cash that Veblen West had access to immediately as it became available. (*See* May 10, 2010 Hearing Transcript at page 158 ("There shouldn't have been any business relationship [between Vantage and Veblen West]. The heifers came out of Vantage into Veblen East and then the fresh cows were supposed to run out to the individual milking herds.")). Despite all of these payments, Veblen West's Statement of Financial Affairs, Exhibits 3B & 3C, signed by Millner on April 21, 2010, do not list any payments to Vantage by Veblen West. (Exhibit AG11, Exhibits 3B & 3C to Statement of Financial Affairs).

The source of this $855,000 "note payable" is itself very questionable. Despite the fact that Veblen East was only buying heifers from Vantage, and not selling Vantage anything, Vantage typically had a significant "negative" accounts payable with Veblen East from March, 2009 – March, 2010. (Exhibit AG23, pages 57-58). In other words, Vantage owed Veblen East money. As of January 31, 2010, the effective date of the February 22, 2010 Assignments,

Veblen East's Vendor Balance Detail showed that it had a "negative" account payable to Vantage of $659,469.40. (Exhibit AG23, page 58). At the same time, and in addition to the negative account payable, PRM also maintained Vantage as a "Customer" of Veblen East with an outstanding accounts receivable of $1,535,065.54. (*Id.*, page 60).[9] Thus, Vantage (which was only selling to Veblen East, not buying anything from it) owed its customer $2,194,534.94. Effective January 31, 2010, in order to create a positive account payable owed by Veblen East to Vantage that could be transferred to and paid by Veblen West, PRM: (1) moved the negative account payable of $659,469.40 to accounts receivable; (2) posted a new account payable of $855,000.00 owed by Veblen East to Vantage for pre-payment of yet to-be-delivered heifers; (3) immediately transferred this new $855,000 payable to Veblen West as part of the assignment and write-off of Veblen East's account receivable owed from Veblen West; and (4) wrote off the $2,194,534.94 owed by Vantage to Veblen East as part of its half of the February 22, 2010 Assignments. (Exhibit AG23, pages 58 & 60). Thus, for only a moment in time did Veblen East ever owe anything to Vantage (and it appears nothing was actually delivered to Veblen East to substantiate that payable) to assign to Veblen West. (*See* May 25, 2010, Hearing Transcript, at page 80 (acknowledgement by Joel Gratz that Veblen East only owed Vantage "for a brief moment in time")).

In fact, the Vendor Balance Detail for Veblen East shows that two additional pre-payments were made by Veblen East to Vantage on February 1, 2010, thereby re-creating the negative account payable within one day back to $507,000 owed by Vantage to Veblen East. (Exhibit AG23, page 58; *see also* May 10, 2010 Hearing Transcript, at page 156 (testimony of

---

[9] Mr. Gratz was, therefore, wrong when he testified that the negative accounts payable on Veblen East's Vendor Detail Report for Vantage was likely there because PRM simply opted to run negative accounts payable to account for Veblen East's heifer pre-pays rather than establish a separate accounts receivable account for Vantage. (*See* May 25, 2010, Hearing Transcript, at pages 49-50).

Glen Steiner that there would appear to be no legitimate business reason why Vantage would owe Veblen East money)).

### d. On the eve of bankruptcy, Millner plundered Veblen West's First Savings account and funneled the proceeds to insiders and favored creditors.

PRM's QuickBooks Bank Activity Report for Veblen West shows that Veblen West had two checking accounts:  Choice Financial and First Savings.  Prior to March, 2010, PRM used the Choice Financial account to deposit the Bongard's milk checks (Exhibit AG27).   This changed as of April 1, 2010, presumably in response to Choice Financial's actions in sweeping Veblen West's accounts on March 19, 2010, to satisfy Vantage's loan obligations to Choice Financial.   On April 1, 2010, $218,629.47 was deposited into Veblen West's First Savings account from Bongard's (apparently representing a patronage dividend), and the Bongard's milk check of $486,966.58 was also deposited into that account (Exhibit AG28, pages 2 & 26).  As of April 1, 2010, Veblen West's First Savings checking account (as reflected in PRM's QuickBooks records) had $641,443.84 (Exhibit AG28, page 2), yet Veblen West's Schedule B lists only $338.51 in that account.  Records obtained from First Savings show the money was dissipated on the eve of bankruptcy:  (1) as discussed above, PRM had Veblen West write a $200,000 check  to Vantage on April 1, 2010 (even though Veblen West owed nothing to Vantage at that time) (Exhibit AG28, pages 12 & 34); (2) $100,000 was wire transferred to the law firm of Leonard, Street & Deinard on April 7, 2010, the date Veblen West filed bankruptcy (Exhibit AG28, page 18);[10] (3) $25,000 was wired to DD-TRF's (Excel Dairy's) account on April 7, 2010 (Exhibit AG28, page 19); (4) $20,000 was paid to DD-Veblen on April 5, 2010

---

[10] In its April 9, 2010 Application, and its Amended Applications filed with this Court, all signed by Millner and attaching an Unsworn Declaration of Counsel, Millner and Leonard, Street both represented to this Court that Leonard, Street had only been paid $30,000 as a retainer.  There has been no explanation provided to explain the discrepancy between this representation and the $100,000 wire from Debtor's First Savings account on the date Leonard, Street filed Debtor's Bankruptcy Petition.

(Exhibit AG, page 32)[11]; (5) PRM had Veblen West pay PRM itself $123,023.31 on April 1st, and another $60,709.02 on April 6, 2010 (Exhibit AG28, pages 30, 31, & 35); (6) various potential preferential transfers to preferred creditors including Cargill of $11,500 on April 7th (Exhibit AG28, page 21)); $13,000 to an entity known as Ag Processing, Inc. on April 7th (Exhibit AG28, page 20), even though that company is not listed anywhere on Veblen West's accounts payables as of April 1, 2010 (Exhibit AG20, page 1); $4,500 to Tenaska Bio-Fuels, LLC on April 7th (Exhibit AG28, page 22), again even though that entity is not listed on Veblen West's accounts payable as of April 1, 2010 (Exhibit AG20, page 1); and $30,610 to Elanco Dairy on April 7[th](Exhibit AG28, page 23).

It also appears that Veblen West wired $100,000 to DD-Milnor on April 2nd, 2010, and DD-Milnor wired $100,000 back to Veblen West on April 5, 2010. (Exhibit AG28, page 12). This transaction does not appear anywhere on PRM's QuickBooks records. (Exhibit AG28, pages 2-3).

All of these transactions are potentially preferential transfers if not fraudulent conveyances. Transfers such as the payment to PRM of $183,000, and to various other insiders, are especially troubling. These payments to unsecured insiders, especially Vantage, were not done in the ordinary course of business. (May 10, 2010, Hearing Transcript, at page 165). "[A] dairy that is in financial distress is going to protect the things it needs the worst and that's going to be the feed supply and the labor, not the cows. And they're going to funnel their cash to where their most important needs are at." (*Id.*, page 165). Veblen West, under the management and control of PRM, did precisely the opposite; it made no payments to Veblen East whatsoever,

---

[11] This $20,000 payment to DD-Veblen was made despite the fact that, according to Mr. Millner's testimony, DD-Veblen is "no longer in existence....I mean, it's not an active company is what I'm saying." (May 10, 2010, Hearing Transcript, at page 20). On May 25th, Mr. Millner attempted to explain these payments by claiming that DD-Veblen was "just billing back the wages" for "two or three employees that are still have visas with Dairy Dozen Veblen". (May 25, 2010, Millner Transcript, at page 26). In fact, however, those payments were periodic, usually about $3500 in amount, and identified as "H2As" on the accounts. (*See, e.g.,* Exhibit AG27, pages 1 & 4).

even though Veblen East was paying its labor, feed, and cow costs;[12] instead, PRM caused

Veblen West to funnel its cash flow to other insiders of PRM and the Dairy Dozen Investors.

The payments made by Veblen West at PRM's direction were neither in the ordinary course of

business, nor necessary for the ordinary operating expenses of a dairy such as Veblen West.  (*Id.*,

page 170).  Even PRM's own accountant, Joel Gratz, acknowledged that payments by Veblen

West to Shortfoot and Vantage so that they could pay their secured lenders at a time when

Veblen West was in default with and had not paid its own secured lenders would not be in the

ordinary course of business.  (May 25, 2010, Hearing Transcript, at page 83 ("Based upon the

assumption that AgStar had the first position, it probably would not be an ordinary course of

business; if they, in fact, have the first position; if that was cash that was available for that.")).

In summary, on the eve of Veblen West's bankruptcy, PRM caused Veblen West to pay

Vantage over $1.066 Million in one month, and during that same month, had DD-Milnor, just

prior to bankruptcy, pay Vantage $230,000.  (Exhibit AG27, pages 1-4).  Under the integrated

model, Veblen West should have had no accounts payable or receivable with Vantage at all.  It

appears that the February 22 Purchase Agreement was entered into for the express purpose of

attempting to preserve creditor claims of insiders to the detriment of Veblen East and its

creditors.  These accounts consisted of unsecured, dated accounts payable that had been, for the

most part, outstanding for months if not years.  Given the status of Veblen East's financial

condition, these payables were unlikely to be paid.  However, at the same time, Veblen East was

advancing Veblen West operating expenses including payroll and feed bills, and Veblen West

was using its milk check to reimburse Veblen East for those advances.  (Exhibit AG25, page 1).

---

[12] Mr. Millner blames Veblen East's receiver for causing a disruption to Veblen East's and Debtor's access to feed, stating that the receiver "didn't pay anybody for February inputs but they still charged Debtor for the inputs it didn't pay for.  And when it stiffed all these people for their February inputs, they put all of our operations on pre-pay." (May 25, 2010 Millner Transcript, at page 40).  What Mr. Millner omits is that because of the manner in which Millner structured these dubious transactions, Debtor never paid Veblen East for the feed charged by and delivered to Debtor, and that without the money that should have been paid over to Veblen East, and had been paid over to Veblen East in the past, the receiver likely had insufficient funds to pay anyone.

The Assignment, in effect, deprived Veblen East of cash flow from Veblen West in exchange for the transfer of dated notes payables held by insiders of Veblen East, all under the direction and control of PRM and Millner, and with the knowledge and consent of the Dairy Dozen Investors, including Michael Wyum.

As this transaction relates to Veblen West, PRM used the newly created payable owed to Vantage to funnel all of Veblen West's cash as soon as it became available to Vantage, including $200,000 on April 1, 2010 when Veblen West did not owe Vantage anything even according to PRM's own books.  (Exhibit AG28, pages 12 & 34).  There is little question that this transfer of $1.066 Million to Vantage over the course of 33 days, constitutes a voidable preference, if not a fraudulent conveyance.

In addition to the immediate pre-petition actions, PRM:  (1) collateralized Veblen West's deposit accounts with Choice Financial to secure Vantage's loan with that entity (Exhibit AG31); (2) obtained a $2.2 Million loan for capital for Veblen West in May, 2008 discussed below, but then not only diverted those loan proceeds, but caused Veblen West to make the interest payments on that loan (Exhibit AG21, pages 8-24 & 40); and (3) created a phantom equity infusion into Veblen East of $2.0 Million in July, 2007 (discussed in detail below) by having Veblen East pre-pay DD-Veblen on its yet-to-be-earned general contractor fees, which was then distributed to the Dairy Dozen Investors and by them, returned to Veblen East as "equity" (Exhibit AG38).

Taken together with the transfer of all of Veblen West's cash to Vantage, these actions demonstrate that PRM is not capable of fulfilling its fiduciary obligations as debtor-in-possession to all interested stakeholders of the Estate, including Veblen West's creditors, and that an operating trustee should be appointed pursuant to § 1104.

2.    **AgStar has proven that Millner, PRM, Wyum, and other investors in Veblen West have crippling conflicts of interest that prevent them from fulfilling their fiduciary duties to Veblen West.**

Even without the existence of the numerous questionable transactions outlined above, PRM has irreconcilable conflicts of interest that preclude its ability to manage as the debtor-in-possession in this case.[13] *See, e.g., In re SunCruz Casinos, LLC*, 298 B.R. at 830 ("Although the Court does not find any fraud, dishonesty, incompetence, or gross mismanagement in this case, the Court does find that the [debtor's management team] has numerous significant, inherent conflicts of interest that implicate several of the *Intercat* factors listed above."); *In re Fiesta Homes of Georgia*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (noting that the "presence of a conflict of interest constitutes cause for removal of Debtor in Possession from administration of [a] case."); *In re Bellevue Place Assoc.*, 171 B.R. at 623 ("inability to fulfill fiduciary duties of a debtor-in-possession is itself cause to appoint a trustee").

### a. Veblen West's management is intertwined with related entities.

Prior to March 3, 2010, Veblen West was part of an integrated dairy production system under the common management of PRM.  (May 10, 2010, Hearing Transcript, at pages 13-14). PRM provides common management for not only Veblen West but also for Veblen East[14]; DD-Milnor, a/k/a Five Star Dairy; and DD-TRF a/k/a Excel Dairy, all of whom were and are borrowers of AgStar.  DD-TRF and DD-Milnor also filed Bankruptcy Petitions under Chapter 11 on April 7, 2010; DD-TRF in the United States Bankruptcy Court for the District of Minnesota (Case No. 10-60438 DDO), and DD-Milnor in the United States Bankruptcy Court for the

---

[13] For purposes of this Motion, AgStar assumes, without agreeing, that PRM need not itself obtain approval to continue to manage Debtor pursuant to 11 U.S.C. § 327.
[14] Veblen East is currently under receivership pursuant to a March 3, 2010, Order entered by the Blue Earth County District Court, State of Minnesota, in the case of *AgStar Financial Services, FLCA et al. v. Veblen East Dairy Limited Partnership et al.*, Court File No. 07-CV-10-714.

District of North Dakota (Case No. 10-30377). Both of these Petitions were also signed by Rick Millner, as the Managing Partner of those respective entities.

In addition, PRM also manages another dairy, New Horizon; a heifer company, Vantage, and a calf operation, Shortfoot Calf Ranch, Inc. ("Shortfoot"), which are also part of the overall integrated dairy production model discussed below. (May 10, 2010, Hearing Transcript, at pages 13-14). New Horizon, Vantage, and Shortfoot have not filed for bankruptcy protection. All of the Dairies are under the common management and control of PRM. (*See, e.g.,* Exhibit AG6 (Management Agreement between Veblen East & PRM); Exhibit D20 (Management Agreement between Veblen West and PRM)); (May 10, 2010, Hearing Transcript, at pages 13-14). Both the Veblen East and Veblen West Management Agreements were signed by Rick Millner on behalf of both the respective Dairies **and** on behalf of PRM. PRM provides day-to-day operations management and comprehensive financial services for these entities, including bookkeeping, record keeping, accounting, and supervision of receipts and expenditures. (May 10, 2010 Hearing transcript at pages 8-9, 13-14; Exhibit AG6). In addition, all of these entities managed by PRM have the same physical mailing address as a PRM except Shortfoot. May 10, 2010, Hearing transcript at 17).

In addition to having the Management Agreements between the Dairies and PRM, Rick Millner himself is the "managing partner" of DD-Veblen; DD-Milnor; DD-TRF; Vantage; Shortfoot (as President); New Horizon (with Wayne Viessman); Veblen East; and Veblen West (until May 10, 2010, discussed below). (May 10, 2010 Hearing Transcript, at pages 19-21). In addition to the Dairies, The Dairy Dozen – Veblen, LLP ("DD-Veblen") is the General Partner of Veblen East, and was the general contractor for the construction of Veblen East; Millner has ownership interests in all of the Dairies as well as DD-Veblen, both directly in his name; and at times indirectly through PRM. (*Id.,* pages 21-24). Millner has also personally guaranteed the

debts of Veblen West, Veblen East, DD-Milnor, DD-TRF, New Horizon, Vantage, and Shortfoot. (*Id.*, pages 24-25).[15]

As mentioned above, Millner, Wyum, and Viessman are not the only owners of Veblen West with interlocking interests. A number of individuals, including the so-called "Dairy Dozen" hold ownership interests in Veblen West, Veblen East, Dairy Dozen-Thief River, and Dairy-Dozen-Milnor, and have guaranteed those entities' debts as well. (Exhibits AG1 and AG2.)

Further complicating the picture, Millner has carried a number of personal loans at Choice Financial Bank including land and operating loans totaling approximately $600,000.00. (May 10, 2010 Hearing Transcript. at 58-59.) He has also had other loans at Choice Financial. One included R&W Heifers (Millner is the "R" in R&W) for $1,500,000.00 as well as additional personal loans ranging from $100,000.00 to $200,000.00. (*Id.* at 59.) As noted above, one of Veblen West's related entities, Vantage is currently financed by Choice as is Veblen West. (*Id.* at 59-60.) Consequently it is no surprise that Millner engineered the Vantage- and Choice-related transactions listed in Section III.A.1.a. above; making sure that Choice was paid was in Millner's best personal interests.

There have been no partnership meetings of Veblen West, nor any of the other entities, since their formation. (May 10, 2010, Hearing Transcript, at pages 60-62).

Under this integrated dairy production model, Veblen East maintained the lactating herd and provided the calving facility for the overall operation. Veblen East also maintained a "special needs herd" for the Dairies, and was designed to milk up to 4,700 lactating and fresh cows. Veblen East had Revolving Dairy Cattle Agreements with the Milking Dairies (DD-Milnor, DD-TRF, and New Horizon) by which Veblen East sold fresh cows to replace culls,

---

[15] In addition, PRM, Millner's brother, and other members of Millner's family own portions of these entities as well. (May 10, 2010 Transcript at 21-24.)

deads and dry cows at the Milking Dairies, and repurchased pregnant dry cows from the Milking Dairies. (*See* May 25, 2010 Millner Hearing Transcript, at pages 16-26 (generally describing the operation)).

The Dairies' integrated production model provided that Veblen East would sell its calves to Shortfoot, which would background the calves, market the bull calves, and at five months, sell the heifer calves to Vantage, which maintains operations in Montana and Minnesota. Vantage then was to sell pregnant heifers back to Veblen East at 16 months. (*Id.*, page 16). The Dairies' integrated production model anticipated approximately 12,000 milking head located at the Milking Dairies and Veblen East at any given time. Although as noted above the Dairies have multiple owners in common, the ownership of each of the Dairies is not identical to the other Dairies, and the ownership group in each Dairy is different. (*See* Exhibit AG2). Vantage's principal lender is Choice Financial, which until April, 2010, also served as the main depository bank for PRM and the Dairies; Vantage has not filed for bankruptcy protection and is not an AgStar borrower. New Horizon, the only Milking Dairy that is not a borrower of AgStar, also appears to have paid off most of its debt.

The integrated production model anticipated that throughout the lifecycle of a cow, the Dairy in possession of the animal would be the owner and would pay the transferring entity a stipulated price at the time of transfer of possession. For instance, when a calf was born at Veblen East, it was sold to Shortfoot for $1.00 per bull calf and $350 per heifer. (May 25, 2010, Millner Hearing Transcript, at page 20). Shortfoot would sell the heifers to Vantage or another feedlot (Louwagie and Cauldron) at five months for $900 - $950 per head. (*Id.*, at page 23) (noting that Shortfoot sells directly to Louwagie and Cauldron, who then subsequently re-sell them to Vantage "at a later time"). Springing (pregnant) heifers were then sold by Vantage back to Veblen East for $1,900. (*Id.*, page 19). After calving, the cow would then be either retained

by Veblen East or transferred to DD-TRF; DD-Milnor; or Veblen West for $2,250 per head. (*Id.*, page 20).[16] After their milking cycles, pregnant dry cows were transferred by that Milking Dairy back to Veblen East for $1900 per head, which would calve them, and according to the model, would return the cow back to the transferring Milking Dairy. (*Id.*, page 19). Culls would be sold by the entity in possession to area livestock barns. PRM was to account for and track these numerous transfers among the Dairies. In addition to the livestock, PRM had Veblen East, in effect, become the "common paymaster" for many of the entities, by which Veblen East would pay various expenses of the other entities, including employee wages, feed costs, and other expenses.

> **b.    The status of the intercompany accounts receivable and payables and other significant records discrepancies demonstrate that Veblen West's current management, even with the best of intentions, cannot protect non-insider unsecured creditors.**

According to the Bankruptcy Schedules filed by Veblen West, Millner and the entities he controls have the following receivables owed to Veblen West:

| | |
|---|---|
| Vantage Cattle Company | $191,800 |
| Veblen East | $1,087,945 |
| O Dakota Heifers[17] | $67,900 |

(Exhibit AG11). In addition to the accounts receivable, the Bankruptcy Schedules show the following unsecured claims against Veblen West by insiders of Veblen West:

| | |
|---|---|
| Cliff Viessman, Inc. | $8,653.28 |

---

[16] Joel Gratz, PRM's outside accountant, was confused when he claimed that the second lactation cows would be sent to Vantage following Veblen East's termination of the heifer contract with Vantage on March 26, 2010. Instead, Mr. Millner testified that the calves from the second lactation cows and higher would be sold by Veblen East to Shortfoot, but that calves from first lactation heifers were sold by Debtor to Shortfoot. (*Compare* May 25, 2010, Millner Transcript, at page 20, *with* May 25, 2010, Hearing Transcript, at page 78). No calves or cows were or are to be sold directly by Debtor to Vantage.

[17] O Dakota Heifers is "a heifer partnership that was – that [Millner] was part of." (May 10, 2010 Hearing Transcript, at page 76).

| | |
|---|---|
| Duayne Baldwin Farm, Inc. | $47,277.78 |
| Excel Dairy | $19,480.00 |
| Five Star Dairy | $357,605.47 |
| Hill Grain Farms, Inc. | $248,300.19 |
| Mark Wyum | $88,019.29 |
| Michael Wyum | $70,019.29 |
| Millner Farms | $78,555.72 |
| New Horizon Dairy | $326,336.15 |
| Pherson Farms | $258,539.12 |
| Shortfoot Calf Ranch, Inc. | $43,618.00 |
| Steve Wyum | $88,019.29 |
| Veblen East | $2,141,509.58 |
| Viessman Trucking | $231,000.00 |

*Id.*

More importantly, there are significant non-insider unsecured claims against Veblen West that have not been paid (Exhibit AG17 at Schedule F) in recent months including Briggs & Morgan ($15,920.01); CMP Dairy Consulting ($7,000); CR Concrete, Inc. ($503,000.00); Dawson Truck Parts ($11,925.66); Gerry & Kulm As, Prof. LLC ($11,147.27); Jacobson Transport ($199,145.34); Lookout Ridge Consulting ($25,636.16); and Riley Brothers Construction ($19,147.11).[18]

Millner admitted that during the year prior to bankruptcy, Veblen West did not have enough money to pay debts as they came due. (May 10, 2010, Hearing Transcript at 85.)

---

[18] This list is not intended to be exhaustive, but instead presents a list of some of the larger non-insider unsecured creditors not favored with payments by Debtor during the preference period. Also, the Debtor has since, as noted below, radically altered some of the values of unsecured claims in subsequent amendments. (Doc. 208.)

Despite this cash-crunch, it is telling to note which creditors Veblen West *has* paid. There are no outstanding amounts owed by Veblen West to PRM, which according to Exhibit 3C of the Statement of Financial Affairs, was paid over $1.077 Million by Veblen West in the last year before the April 7th filing, including over $226,000 from March 24, 2010, through April 6, 2010, a period of about two weeks immediately before the filing. DD-Veblen, the company that is "no longer in existence" and is "not an active company" received over $181,500 from Veblen West in the past year according to Veblen West's Statement of Financial Affairs, Exhibit 3C. (*See* May 10, 2010 Hearing Transcript, at page 20). Five Star was paid $115,954.85, although there would be no business relationship between Veblen West and Five Star under the production model developed by Mr. Millner. (*Id.*) As mentioned above, Vantage is not even listed in Veblen West's schedules and statement of affairs as having received any payments from Veblen West, although the evidence demonstrates that in fact it had been paid approximately $1.066 Million in the five weeks immediately before the April 7, 2010, filing. Meanwhile, a myriad of Veblen West's non-insider unsecured creditors, some of whom are listed above, were paid little or nothing.[19]

In summary, in addition to Veblen West, PRM has contractual obligations to manage Vantage; New Horizon; DD-TRF; DD-Milnor; and DD-Veblen. PRM currently is acting as the debtor-in-possession on behalf of Veblen West; DD-Milnor; and DD-TRF. As described above, the significant amount of cash transferred by Veblen West (i.e., by PRM) to Vantage itself demonstrates the impossible position PRM is in should it remain in management of Veblen West. Veblen West clearly needs to pursue claims against Vantage and PRM itself for the preferential transfers described above. PRM orchestrated and directed these transfers, and

---

[19] Mr. Millner attempted to shunt responsibility for these preferential decisions by claiming that PRM's controller, Shan Betzold, makes the decisions on behalf of all the entities as to which creditors are paid, how much they are paid, and when they are paid. (May 10, 2010 Hearing Transcript, at page 85). Mr. Millner, however, is Mr. Betzold's supervisor. *Id.*

simultaneously would have a conflicting contractual obligation to assert defenses (if defenses there be) to the preference claims on behalf of those respective entities. PRM itself was paid over $1.0 Million within the last year by Veblen West alone, and purports to represent affiliated entities with claims of $19,480 by DD-TRF; $357,606.47 by DD-Milnor; $326,336.15 by New Horizon; and $43,618.00 by Shortfoot. (Exhibit AG11, Schedule F). Veblen West may very well need to contest the validity of some if not all of these claims, and PRM would necessarily need to negotiate with itself over these claims (and other investor insider claims). Simply stating the issue demonstrates the impossibility of PRM's position, to say nothing of Millner's identical problems. *See In re Concord Coal Corporation*, 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981) (investigation of transfers to one-third owner could not be expected when that owner was in charge of management); *see also, In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W.Va. 1980) (appointing trustee where "[t]he magnitude of the number of inter-company transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor].")

Further, the same considerations which led the Court to reject Veblen West's Application to retain Leonard, Street apply with equal, if not greater, force to PRM, which directed the numerous financial transactions summarized above. *See In re Concord Coal Group*, 11 B.R. 552 (Bankr. S.D. W. Va. 1981) (holding that Court has discretion to appoint a trustee where the loyalty of company management is substantially called into question by its many competing business interests).

### c. Veblen West's appointment of Michael Wyum as General Partner of Veblen West on the first day of the hearing on AgStar's motion was a sham, and a transparent attempt to leave Millner in control.

Courts have found appointment of a Trustee more desirable when the debtor itself has acknowledged the need for independent management. *See In re Euro-American Lodging Corp.*, 365 B.R. at 432. In *Euro-American Lodging*, the Court noted "[debtor's] acknowledgment that it needs outside operational management is an 'important factor' in deciding to appoint a trustee under § 1104(a)(2)..." *Id*. On both days of the hearing, Millner admitted that it was not in Veblen West's best interest for him to remain as managing partner because there needed to be someone in a fiduciary position that did not have a conflict of interest regarding the above-referenced transactions- a person that could act solely in the interest of Veblen West. (May 10, 2010 Transcript at 18-19, Millner Transcript at 4-5.) This admission, standing alone, magnifies the need for management independent from Millner and PRM.

Veblen West, in a transparent effort to suggest that it was providing that independent management, had Millner resign as managing partner of Veblen West, supplanted by Michael Wyum. However, the undisputed facts regarding that alleged change in authority reflect that Wyum is so inadequately informed regarding Veblen West's business, and so deeply involved in the various entities, that he is in no better a position to provide independent leadership. Instead, the entire transfer of authority was a sham, and is entitled to no weight here.

On May 10, 2010, the date of the first part of the evidentiary hearing on the instant motion, the partners of Veblen West purported to take a "Joint Record of Action of the Partners of Veblen West Dairy, LLP Adopted Without a Meeting", replacing Rick Millner as Managing Partner of Veblen West with Michael Wyum. (Exhibit D19). The document itself recites that "the undersigned, being all of the partners of Veblen West Dairy, LLP," when in fact not all of the partners even executed the written action. (Exhibit D19, pages 2-3). Moreover, the Written

Action contains a resolution that "the actions taken by the Managing Partner, Richard Millner, prior to the resolutions herein adopted are hereby ratified, approved, and confirmed." (Exhibit D19, page 1). In short, with no analysis or investigation, the majority partners of Veblen West preemptively ratified all of Rick Millner's actions to date on behalf of Veblen West.

No action was taken by the partners to terminate or amend the Management Agreement between Veblen West and PRM (Exhibit D20), which authorizes PRM (owned and controlled by Rick Millner) to provide financial management, general management, and farm management for Veblen West. As noted above, PRM "does the bookkeeping, the recordkeeping, and the accounting for its clients" including Veblen West. (May 10, 2010 Hearing Transcript, at page 8).

Michael Wyum is also one of the Dairy Dozen insiders. He owns 6.88% of Veblen West; 7.09% of DD-TRF; 6.02% of DD-Veblen; and 2.2% of DD-Milnor. (Exhibit AG2). He owns 11% of Vantage, one of the entities that were favored in Millner's preferential transactions in Section III.A. above. (May 10, 2010, hearing Transcript, at page 212). He acknowledged that he doesn't "plan to be the operational manager, but I can certainly oversee it," (*Id.*, page 217), and that "PRM is continuing with its management services for [Veblen] West." (*Id.*, page 221). Mr. Wyum is a guarantor of debts to Veblen East, DD-Milnor, DD-TRF, and Vantage (*Id.*, page 219). Having been "somewhat familiar" with the financial affairs of Veblen West, and having personally sat through the testimony of Rick Millner and Glen Steiner regarding the financial irregularities described throughout this Memorandum, Mr. Wyum gave no indication that he intends to seriously examine or question those transactions. Indeed, Mr. Wyum stated that he found nothing objectionable regarding those matters whatsoever. (*Id.*, pages 221-22).

This is because Michael Wyum was deeply involved in Millner's self-dealing, preferential transfers, and fraudulent conveyances. He was part of the February 22, 2010 Assignments, and signed the assignment transferring his note receivable owed by Veblen East to

Vantage Cattle Company in the amount of $46,933.53. (Exhibit AG4, pages 21 & 25). He also signed the assignment transferring $88,019.29 of his claims against Veblen East to Veblen West. (Exhibit AG5, pages 21 & 24). He signed a $1.1 Million Guarantee in favor of Choice Financial as part of the transaction by which Rick Millner pledged all of the entities' deposit accounts as collateral for Vantage's loans. (Exhibit AG23, page 45). Indeed, both Mr. Wyum and the other Dairy Dozen Investors have personal liability under their guarantees with not only Veblen West, but Vantage, DD-Milnor, DD-TRF, and Veblen East; potential liability which creates a conflict in their ability to negotiate and resolve the competing claims of these entities with Veblen West in the best interests of all stakeholders.

Perhaps most-tellingly, Mr. Wyum, despite being the named Managing Partner for Veblen West, did not bother to appear for the May 25th evidentiary hearing, while Millner was in attendance, and testified that the outcome of hearing was important to Veblen West. (May 25, 2010 Millner Transcript, at pages 48-49). As of May 25, 2010, Mr. Wyum had not spoken to Joel Gratz, Veblen West's accountant, at all. (May 25, 2010 Hearing Transcript, at page 70). Moreover, at the First Meeting of Creditors, it was obvious that Wyum's knowledge regarding Veblen West's financial affairs was not even rudimentary. (First Meeting Transcript.) It is clear, based upon these facts, that Wyum's appointment as managing partner was a ruse, that Millner, through PRM, will still manage Veblen West's affairs, and that it will be business as usual.

### 3.  Veblen West's management has consistently favored certain insiders and creditors over other owners, lenders, and unsecured creditors.

Another factor bearing on the appointment of a Trustee is whether Veblen West's management has shown an inability to treat all owners and creditors evenhandedly. The discussion above on the payments to insiders of Veblen West over the past year, and especially in the week leading up to April 7, 2010, filing, demonstrates that PRM has not and cannot be

evenhanded in dealing with insiders and affiliated entities as compared to other secured and unsecured creditors.

The Schedules for affiliated entity DD-Milnor show similar payments to affiliated and insider entities. Millner acknowledged that throughout the last year, DD-Milnor did not have the cash necessary to pay creditors as debts became due. (May 10, 2010 Hearing Transcript, at page 91). Millner, as he had in managing Veblen West, made sure that insiders got many of the payments that actually were made. For instance, DD-Milnor has made payments to Excel Dairy of $445,264.65 over the past year, leaving a net due of $1,200.00. (Exhibit AG12, Statement of Financial Affairs, Exhibit 3C, page 1). An insider, Roger Gibbon, received $242,176.05 through his company and $34,649.52 personally. (*Id.*, pages 1-2). PRM was paid $406,560.67, and is only owed $15,850.09 currently. (*Id.*). New Horizon was paid $31,849.52, and has no outstanding claim against DD-Milnor (*Id.*). DD-Milnor's Statement of Financial Affairs states that Veblen West was paid $203,007.98 by DD-Milnor and currently has no amount owed and outstanding. (*Id.*, page 4). Meanwhile, a number of the larger unsecured non-insider creditors, including but not limited to Bruce Speich ($47,522); Jacobson Transport ($44,528.29); Nutrition Physiology Corp. ($28,800); and Riley Brothers Construction ($107,299.30), either received no payments, or only fractional amounts in relation to their claims. (Exhibit AG12.)

The Schedules for affiliated entity DD-TRF show that DD-Milnor has an unsecured claim of $222,140.00. (Exhibit 13, page 18). It shows that PRM has been paid in full. (*Id.*, page 22), and that Veblen East is owed $257,034.56. (*Id.*, page 24). Despite not having any livestock since early 2009, on January 11, 2010, DD-TRF paid Rick Millner $6,406.90, and paid PRM $7,724.86 on January 6, 2010 (*Id.*, page 44). DD-TRF also paid DD-Milnor $13,417.15. (*Id.*, page 47). Non-insiders from DD-TRF's list of 20 largest unsecured creditors (Exhibit AG13) such as Advanced Aeration ($47,625.84); Aerotech ($51,347.03); Center 4 Toxicology &

Environ. Health ($91,860.08); CR Concrete ($59,835); Davidson Ready Mix ($32,429.81); Farmers Union Oil ($28,814.70); Kristen, Inc. ($78,629.48); Triple D Construction ($81,375.58) remain unpaid, like similar creditors of Veblen West and DD-Milnor.

Time and again, PRM and Millner have repeatedly shown that they have and will continue to favor the original "Dairy Dozen" investors to the detriment of other stakeholders, and specifically creditors. PRM orchestrated a $2.0 Million conversion of equity to debt for this group from Veblen East and transferred that debt to DD-Veblen, in an attempt to preserve that interest in the face of the impending failure of Veblen East. PRM and Millner, of course are themselves part of the "Dairy Dozen," as is Michael Wyum. PRM quickly moved significant amounts of cash from Veblen West to Vantage, part of which appears to have been re-payment of loans from Choice Financial to Rick Millner and Wayne Viessman. The February 22 Assignments of debt out of Veblen East to Veblen West and Vantage were a transparent attempt to: (1) attempt to preserve the claims of these insiders by placing those claims with entities that had a higher likelihood of avoiding liquidation than Veblen East had at the time; and (2) to deprive Veblen East of cash by cancelling receivables owed to it by Veblen West and Vantage, at a time when the insiders had almost certainly come to the conclusion that Veblen East was insolvent, and likely facing receivership.

The additional payment to PRM of almost $200,000 in the early part of April, 2010, further demonstrates clearly that current management has and will likely continue to favor insider claims to the detriment of the other stakeholders in Veblen West and to the detriment of the estate.

#### 4. PRM has demonstrated persistent self-dealing and squandered corporate assets of Veblen West since long before the bankruptcy.

Another *Intercat* factor is the presence of self-dealing, or waste of debtor's assets. As discussed above, PRM, through Millner, has repeatedly engaged and self-dealing and otherwise shown that it is not capable of fulfilling its fiduciary obligations to all stakeholders in the Estate as the debtor-in-possession. PRM paid itself over $183,000 in the week before filing Veblen West's petition. PRM transferred over $1.066 Million of cash of Veblen West to pay Vantage, an affiliated entity with an unsecured, dated note payable. PRM, through Millner, orchestrated the February 22, 2010 Assignments in an attempt to protect the Dairy Dozen Investors. PRM, through Millner, caused Veblen West to wire Leonard, Street $100,000 on the date it filed bankruptcy. The transactions described below demonstrate that Millner's conduct on the eve of bankruptcy was part of a long history of similar transactions.

##### a. The proceeds of the May 2008 loan from CTSF North America to PRM were not used for the stated purpose of injecting capital into Veblen West.

On May 8, 2008, PRM entered into a loan with CTSF North America, Inc. ("CTSF") for $2.3 Million Loan "to finance a capital injection into Veblen West Dairy LLP in the form of the Subordinated Loan." (Exhibit AG21, pages 8 – 24 & page 12).[20] The Loan was executed by Rick Millner as CEO of PRM. (*Id.*, page 23). That same day, Veblen West and PRM entered into a "Subordinated Loan Agreement" whereby PRM would "make a capital contribution to Veblen West Dairy LLP in an aggregate principal amount of US$2,250,000 in the form of a convertible subordinated loan." (*Id.*, page 25). Millner signed this Subordinated Loan Agreement on behalf of both Veblen West and PRM. (*Id.*, pages 38 & 39).

---

[20] The Subordinated Loan to Debtor was to be for $2.25 Million; the remaining $50,000 was for the Loan Fee to CTSF. (*Id.*).

Millner claims that all of the loan proceeds went to Veblen West. (May 10, 2010 Hearing Transcript, at pages 71-72). However, none of the loan proceeds went to Veblen West at all. PRM's QuickBooks report shows that the $2.25 Million loan was deposited into PRM's Choice Financial Account on May 9, 2008. (*Id.*, page 41). At the time, PRM's account was overdrawn by $321,960.05, and the loan proceeds were used to payoff that overdraft first. Then, PRM made a loan to Veblen East (not Veblen West) of $1.6 Million, and essentially allowed Choice Financial to use the balance to make two loan payments for R & W Heifers (which is a d/b/a for Rick Millner and Wayne Viessman individually)[21] totaling $183,431.38, and another payment to Dairy Dozen Heifers (i.e., Vantage) of $102,887.43. (*Id.*) Despite this, however, PRM still caused Veblen West to pay the interest on the CTSF Loan as it became due. (*Id.*, page 40) ($151,161.11 installment payment on November 2, 2009).

As part of its year-end 2008 review of PRM's records, Veblen West's CPA firm, Christianson & Associates identified this problem, stating "the money was to be used as a capital injection for Veblen West LLC, this does not appear to have been how the money was used….Interest accrued and paid by Veblen West is to the be the expense of PRM and therefore a payable to Veblen West has been accrued and interest expensed." (Exhibit AG21, page 6). In other words, the only adjustment Christianson required was to create a payable in favor of Veblen West and owed by PRM for the interest Veblen West had paid on the loan it did not receive. (May 25, 2010, Hearing Transcript, at page 91). In fact, however, despite the direction from Christianson that since this loan never benefitted Veblen West it should not be paying the interest, PRM/Millner had Veblen West make another interest payment on this loan in November, 2009, of $151,161.11. (Exhibit AG21, page 40).

---

[21] (*See* May 10, 2010 Hearing Transcript, at page 68).

b.      **The Veblen East insider equity infusion was a sham.**

Veblen East's QuickBooks records purported to show that on July 30, 2007, the so-called "Dairy Dozen" group of investors injected $2.0 Million of equity into Veblen East. (Exhibit AG21, page 1). In fact, however, this equity infusion was a sham. The same group of investors constitutes the owners of Dairy Dozen Veblen, the general contractor for the construction of Veblen East and the general partner of Veblen East. (Exhibit AG2). Exhibit AG38 shows the true source of this $2.0 Million equity infusion. PRM caused Veblen East to make an "advance payment to general contractor", i.e., Dairy Dozen Veblen, of $2.0 Million in cash from Veblen East's Choice Financial account. (Exhibit AG38, page 3). The Dairy Dozen Veblen then immediately paid out that cash to the "Dairy Dozen" investors in the precise amounts of their equity payments into Veblen East, and took notes receivable from these investors in exchange. (*Id.*, page 2). These investors then immediately "invested" this $2.0 Million back into Veblen East. (*Id,* page 1). In other words, PRM/Millner created a false appearance of a $2.0 Million equity infusion by causing Veblen East to pre-pay its general contractor (also controlled and operated by Mr. Millner) the funds necessary to make that payment.

At year-end 2009, PRM converted $2.0 Million of this insiders' equity into debt, which was then transferred to DD-Veblen.[22] (Exhibit AG21, page 1). "Generally, businesses that are in financial distress obtain equity from their owners, they don't return it." (May 10, 2010 Hearing Transcript, page 182 (testimony of Glen Steiner)). Such a transaction would not be in the ordinary course of business. (*Id.*). It appears that PRM then created numerous payables owed by Veblen East to DD-Veblen in its Construction in Progress Account, which had been at a zero balance as of December 31, 2008, and remained inactive throughout 2009. (Exhibit AG21,

---

[22] Veblen East also had $16.0 Million of equity from a number of Korean investors, which was increased by $2.0 Million on May 15, 2009 (Exhibit AG21, pages 2-3). The same day PRM converted the "Domestic Investors'" equity (December 31, 2009) to debt, it also converted $2.0 Million of the Korean Investors' equity to a note payable, but this note payable still appears to remain with Veblen East as an unsecured note payable. (*Id.*, page 3).

page 4). PRM added $942,211.08 of payables owed to DD-Veblen for construction on December 31, 2009 (even though a General Journal entry dated May 30, 2008, showed that DD-Veblen had "convert[ed] Gen Contr fees to equity" in the amount of $4,080,000.00). (Exhibit AG21, pages 1 & 4) Although the details of this transaction remain unclear, it appears that the account payable was created solely as a means to transfer equity out of Veblen East, which at the time PRM/Millner and the insiders likely suspected would be the first entity to fail. It appears that this transfer was motivated by similar reasons as the February 22nd Assignments, as a desperate attempt by Millner and PRM to preserve the claims of the Dairy Dozen insiders by removing them from Veblen East and trading them for current accounts receivable, thereby depriving Veblen East of necessary operating capital.[23]

Mr. Gratz originally claimed that this transaction was simply an accounting adjustment to correct an over credit of equity in favor of Dairy Dozen Veblen of $4,080,000, which should have only been $2,000,000. (May 25, 2010, Hearing Transcript, at page 64). In fact, however, the adjustments did not reduce Dairy Dozen Veblen's equity at all, but instead pulled out the Dairy Dozen investors' equity from Veblen East. (Exhibit AG21, page 1). After lunch, Mr. Gratz corrected himself by recognizing that the documentation simply did not support his earlier testimony. (May 25, 2010, Hearing Transcript, at pages 66-67).

### 5. PRM's and Millner's Misconduct is Material.

PRM's and Millner's misconduct is material. The volume and amounts of the various intercompany transfers, done for the benefit of the investors to the prejudice of the Dairies' creditors, reflect significant transfers of cash and assets with no underlying business justification whatsoever. The above facts are based only on a preliminary review of the numerous intercompany transfers orchestrated by PRM through Millner. AgStar has not had the

---

[23] On December 1, 2009, PRM similarly converted equity payments into debt for the partners of New Horizon. (Exhibit AG21, page 5).

opportunity to review the voluminous intercompany transfers that purport to be ordinary course transactions.  It is likely that the substantial evidence AgStar presented is only a small part of the picture.  However, even the limited initial review summarized in part above demonstrates that PRM and Millner used the assets and resources of each of the entities interchangeably, and move cash and accounts at will to suit their immediate needs.  The only consistent theme was that PRM would protect itself first, and then the interests of its "Dairy Dozen" investors to the detriment of the Dairies' creditors and other stakeholders.  As to Veblen West alone, PRM transferred over $1.066 Million to Vantage; transferred to itself $183,000; transferred to Leonard, Street $100,000; transferred to Excel Dairy, $25,000, and arranged for numerous other questionable transfers.  Further investigation is necessary to determine the extent to which PRM accounted for cow and cattle movement among the entities, and other transactions, but what has been discovered to date establishes beyond cavil that PRM and Millner cannot fulfill fiduciary obligations in managing a debtor-in-possession, and that an operating trustee should be appointed for Veblen West pursuant to 11 U.S.C. § 1104(a)(1) & (a)(2).

One example will highlight the materiality of PRM's and Millner's misconduct to date.  As noted above, on the day it filed Veblen West in bankruptcy, PRM caused Veblen West to wire $100,000.00 to Leonard, Street and Deinard.  On April 9, 2010, Richard Millner, as the managing general partner of Veblen West, signed an Application to Employ Leonard, Street and Deinard as Chapter 11 counsel, stating therein that "Veblen West has reviewed the Unsworn Declaration of Robert T. Kugler and believes the attorney selected by Veblen West do not represent any non-debtor entity in connection with this case, do not hold or represent any interest adverse to the estate, and are disinterested under § 327 of the Bankruptcy Code."  The accompanying Unsworn Declaration of Robert T. Kugler and statement of compensation stated in Paragraph 7 that "Veblen West paid the firm a retainer of $30,000.00 for legal fees it expects

to incur in connection with this Chapter 11 case and Leonard, Street and Deinard will hold the retainer in its trust account pending further court order." No disclosure was made by either Veblen West or Mr. Kugler that in fact, at the time of that application, Leonard, Street and Deinard was and is representing PRM, Vantage Capital Company, Dairy Dozen – Veblen, Shortfoot Cattle Company, and New Horizon Dairy in the state court action in Blue Earth County District Court, State of Minnesota. No explanation was provided that, rather than $30,000, Veblen West had in fact transferred $100,000 to Leonard, Street, & Deinard on the date it filed bankruptcy.

On April 14, 2010, Veblen West (through Millner) filed an amended Application to Employ Chapter 11 Counsel in which Leonard, Street and Deinard disclosed that it was also seeking to represent Dairy Dozen – Thief River Falls d/b/a Excel Dairy and Dairy Dozen – Milnor d/b/a Five Star Dairy, but the disclosure still did not amend the representation that Veblen West had only paid Leonard, Street and Deinard "a retainer of $30,000.00 for legal fees it expects to incur in connection with this Chapter 11 case." Docket No. 48, para. 8. Neither Veblen West's Application nor the accompanying Unsworn Declaration disclosed the pending State Court Receiver action, in which Leonard, Street and Deinard was representing PRM, Vantage, New Horizon, Dairy Dozen – Veblen, and Shortfoot in addition to the three entities which had filed for bankruptcy protection. The Application did not disclose or explain that, in fact, Veblen West had wired Leonard, Street $100,000 on April 7th, not $30,000 as claimed in the Unsworn Declaration.

**B. AgStar has presented compelling evidence of Veblen West's mismanagement apart from the *Intercat* factors.**

As noted above, Section 1104(a)(1) does not provide an exclusive list of grounds for finding "cause" for appointment of a trustee. See *In re Marvel Entertainment Group, Inc.*, 140

F.3d at 472 ("the language of § 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed, but rather provides that a trustee shall be appointed 'for cause, including fraud, dishonesty, incompetence, or gross mismanagement ... or similar cause'"). Apart from Millner's self-dealing, preferential transfers, fraudulent conveyances, and conflicts of interest described above, AgStar has presented evidence regarding other aspects of Millner's/PRM's management that demonstrates that appointment of a trustee is necessary.

### 1. PRM's/Millner's mismanagement of environmental matters has caused the shut-down of one of Veblen West's related entities, and Veblen West and Veblen East now face a similar fate.

Rick Millner is Veblen West's primary contact person on environmental matters, and is also the contact person for its related entities. (May 10, 2010, Hearing Transcript, at pages 35-37). Millner, acting through PRM, has left four dairies in three states with significant environmental-compliance problems. During the hearing, Veblen West tried to claim that these issues all relate to the unusually-high amount of rainfall in Veblen, South Dakota, in recent years. However, the undisputed facts do not support this claim.

First, DD-TRF, a Minnesota dairy known as "Excel," has been shut down. It was not shut down simply because of too much rainfall, or because of too much water in its lagoons or basins. It was shut down because Millner's/PRM's mismanagement allowed serious air pollution and displayed serial noncompliance with state directives regarding structural improvements.[24] (Exhibit AG7). How can it be anything but gross mismanagement when a dairy's neighbors are getting sick from the odors being generated by the facility, and when a federally-funded study has concluded that the dairy is a "public health threat[25]?" (Exhibit AG18,

---

[24] Much of Excel's non-compliance related to things unaffected by the weather such as failing to install proper facilities, and failure to remove feedstocks after the cattle were gone. (Exhibit AG7, at ¶¶ 15- 17).

[25] MPCA referred to Excel as a "public health threat" because the United States Department of Health and Human Services conducted a Heath Consultation and Exposure Investigation and concluded, in what the MPCA described as an "unprecedented step," that Excel was a "public health hazard." (AgStar Exhibit AG7, at ¶54; Exhibit AG18, at

at page 5.)   The record demonstrates that Millner's/PRM's mismanagement has been far from isolated.  Instead it has been significant and serial.  Excel had a history of non-compliance with Minnesota regulations, a history of acting without authorization from the MPCA, consistently violated air quality standards, and consistently failed to comply with administrative orders. (Exhibit AG7, at ¶¶ 3-57).[26]  Millner's complicity in Excel's shut down can only be described as gross mismanagement.

Veblen West's witnesses and attorneys have spoken a great deal about the jobs that are at risk in Veblen if a Trustee is appointed.  One thing is certain--there are no cows being milked at Excel Dairy.  No one is working there.  Whatever value the Excel facility still has in the wake of the environmental problems that occurred, Millner/PRM clearly played the lead role in causing it to plummet.  In short, the real concern is what will happen to Veblen West and the jobs in Veblen if a Trustee is not appointed?

AgStar presented compelling evidence that answers this question emphatically.  Millner's mismanagement of the Dairy Dozen-Milnor, in North Dakota,[27] and of Veblen West and Veblen

---

5).  The reasons for this finding  related to dangerous levels of airborne hydrogen sulfide emissions that were causing toxic effects on neighbors such as burning eyes, nausea, and other illnesses triggered by the odor and air pollution. (May 10, 2010, Hearing Transcript, at pages 37-38).  MPCA had ordered Excel to remedy the problem by covering the basins from which the emissions were being generated, but Excel failed to do so, even after being specifically contacted by MPCA's feedlot engineer assigned to the matter.  (Exhibit AG7, at ¶¶ 50-52).

[26] The MPCA specifically noted that "this is not a situation where the permittee failed to implement one or two permit requirements.  Instead, the company has failed to comply with virtually all of the provisions of its new permit.  Most notably, the company failed or refused to timely implement measures that were designed to alleviate a formally-declared public health threat."  More troubling is the fact that Excel's management (i.e., Millner and PRM) responded to the MPCA's concerns about these issues by claiming that its failures were "immaterial." (Id. at ¶¶ 37, 40, 45).

[27] Details of DD-Milnor's issues with the North Dakota Department of Health are found at Exhibit AG9 and Exhibit AG10.  In August 2009, Dairy Dozen-Milnor entered into a consent agreement with the Department of Health noting the height of the water levels in its lagoons, but more importantly, emphasizing that the dairy had not acted to prevent erosion and degradation to the holding facilities caused by those water levels.  (Exhibit AG9, at pages 3-4). Later, in March and April 2010, the dairy entered into an agreement with the Department of Health acknowledging another time period where it had again allowed the water in retention facilities to degrade and erode those facilities. (Exhibit AG10, at pages 2-4).  Millner admitted that in the North Dakota matter, the second notice of violation had related in part to problems that had not been addressed from the first notice.  (May 10, 2010, Hearing Transcript, at

East, in South Dakota, has brought those facilities to the brink of a similar crisis. Veblen West and Veblen East have received multiple notices of environmental violations from the South Dakota DENR, so it is entirely possible Veblen West's facility will face the same plight as the Excel facility. Millner acknowledged, and a representative of DENR testified, that most of the issues raised in earlier DENR notices of violation were still outstanding and had not been resolved when later notices of violation were issued. (May 10, 2010, Hearing Transcript, at pages 42-43; 111). Although Veblen West, in its brief on the issue, characterized the violations as "relatively minor," the DENR representative, Jeanne Goodman, testified that DENR believes the violations "posed a very serious situation for the environment of South Dakota," and even Millner acknowledged that the problems were "something in between" major and minor. (*Id.*, at pages 44; 110). Goodman further testified that if Veblen West does bring itself into compliance with South Dakota law, it is very possible that the dairy will be shut down, and Veblen West will be out of business. (*Id.*, at pages 113-114).

As is the case with the Minnesota violations, many of the South Dakota violations have nothing to do with Veblen West's weather-related red-herring, and everything to do with Millner's/PRM's inability to follow the rules:

- Exhibit AG15 is an Amended Notice of Violation Order, which details Millner's and PRM's failure to follow the directives in a previous Notice of Violation. (Exhibit AG14) Veblen West failed to "develop and submit to DENR a plan with a schedule for restoring the waste water elevations in each of the manure containment systems holding ponds at Veblen West Dairy LLP, and Veblen East Dairy LLP . . . by October 19, 2009." (Exhibit AG15, at ¶ 22(a)).

- Veblen West also failed to submit a report to DENR showing the current elevations of waste water in each of the holding ponds and the existing manure management systems for Veblen East and Veblen West Dairies. (*Id.* at ¶ 22(c)).

---

pages 40-41). While the weather might have impacted the water levels in Dairy Dozen Milnor's facilities, the dairy still could have acted to address the impact of those water levels on the structural integrity of the retention facilities.

- Veblen West failed to hire an engineer to preparing emergency response plans for both Veblen West Dairy and Veblen East Dairy, but had its own dairy personnel prepare the response plan. (*Id.*, at ¶ 22(d)).

- Veblen West failed to submit an engineering plan that complied with DENR's directives on how to put that report together.  (*Id.*, at ¶¶ 22(e) and 22(f)).

- Veblen West discharged water from its holding ponds without reporting it to DENR. (*Id.*, at ¶¶ 26-27) (noting that such failure to report any discharge to DENR as soon as possible was a violation of Veblen West's general permit and SDCL 34A-2-36 and 34A-2-36.2).

- DENR inspections revealed that Veblen West's permanent marker was missing from one holding pond, and the permanent marker in another holding pond appeared to have been damaged or broken off.  (*Id.*, at ¶¶ 28-29) (noting that failure to maintain permanent markings in the holding ponds is a violation of Veblen West's general permit and SDCL § 34A-2-36 and 34A-2-36.2).  DENR staff also noted stockpiles of used sand and manure solids at Veblen West Dairy that were located in areas not included in Veblen West's approved management system plans.  (*Id.*, at ¶¶ 30-31) (noting this was a violation of the general permit and SDCL 34A-2-27, 34A-2-29, 34A-2-36, 34A-2-36.2).

- DENR documented eight applications of manure and/or process waste water to fields that were not in Veblen West's approved plan prior to the land application of manure and/or process waste water during 2008 and 2009.  (*Id.*, at ¶¶ 32-33) (noting that applying manure to a field not in the dairy's approved nutrient management plan is a violation of Veblen West's general permit and SDCL 34A-2-36 and SDCL 34A-2-36.2). DENR staff further noted that records documenting application dates and methods were missing or had inaccurate dates, and daily inspection documentation of land application sites were not available for applications in 2008 and 2009. (*Id.*, at ¶¶ 34-35) (noting violations of the general permit and SDCL 34A-2-36 and SDCL 34A-2-36.2).

The problems and issues listed above had nothing to do with how much rain fell in Veblen during the applicable time period, and everything to do with Millner's/PRM's inability to manage Veblen West's and related entities' environmental problems responsibly.  The weather should not have interfered with Millner's and PRM's ability to keep the proper records, report problems to DENR, apply manure to the right fields, design physical facilities that complied with the rules or, most importantly, address problems that had already been brought to Veblen West's attention before.

The DENR has noted additional violations related to PRM's and Millner's management of Veblen East:[28]

- Veblen East apparently made past discharges from its manure containment systems and manure waste water reached an unnamed wetland in violation of its general permit and SDCL 34A-2-36 and 34A-2-36.2, and had caused pollution of waters to the state in violation of SDCL 34A-2-21 and ARSD 74:51:01:06. (Exhibit AG17a at ¶¶ 28-31). The discharges of process waste water from the holding ponds were not reported to DENR in violation of SDCL 34A-2-36 and 34A-2-36.2. (*Id.*, at 32-33.)

- Permanent markers were missing from several holding ponds at Veblen East Dairy in violation of its general permit and SDCL 34A-2-36 and 34A-2-36.2. (*Id.*, at ¶¶ 34-35.)

- A stockpile of used sand at Veblen East Dairy was located in an area not included in the dairy's approved manure management system plan in violation of Veblen East's general permit and SDCL 34A-2-27 and 34A-2-29, 34A-2-36, 34A-2-36.2. (*Id.*, at ¶¶ 36-37).

- Veblen East failed to document a daily inspection for each field on each day when land applying and irrigating manure and process waste water in 2008 and 2009 in violation of the general permit and SDCL 34A-2-36 and SDCL 34A-2-36.2. (*Id.*, at ¶¶ 38-39). It also did not have application rate calculations from land application and irrigation of manure and process waste water during the spring of 2009 and the summer of 2009 in violation of the general permit and SDCL 34A-2-36 and SDCL 34A-2-36.2. (*Id.*, at ¶¶ 40-41). Veblen East also made 22 applications of manure and/or process waste water to fields that were not in the dairy's approved nutrient management plan during the fall of 2008 and the fall of 2009 in violation of the general permit and SDCL 34A-2-36 and SDCL 34A-2-36.2. (*Id.*, at ¶¶ 42-43).[29]

Ironically, Veblen West's effort to gloss over these problems by blaming the weather only magnifies its indifference to environmental issues. Veblen West cannot credibly claim that the rain that has fallen in Veblen is responsible for the poor state of Veblen West's record-keeping practices, that the weather interfered with Veblen West's ability to get permission before acting or that the water in the lagoons prevented Veblen West from communicating with the various government agencies responsible for environmental concerns. Instead, PRM's serial

---

[28] Lest Debtor attempt to suggest that the issues raised by DENR regarding Veblen East are the fault of the receiver, Veblen East's receiver was not appointed until March 3 2010. The violations listed by DENR all relate to issues that arose before that appointment. In other words, Veblen East's receiver inherited the consequences of Millner's/PRM's environmental mismanagement.

[29] Millner acknowledged at the hearing that some of the issues raised in the first DENR notice of violation were still outstanding and had not been resolved when the second notice of violation was issued. (May 10, 2010, Hearing Transcript, at pages 42-43.)

violation of multiple states' regulations regarding pollution control is the epitome of mismanagement. That mismanagement has placed Veblen West in danger of being shut down, just like Excel was shut down.

### a. Veblen West's initial bankruptcy filings and subsequent amendments are litigation strategy designed to keep Millner in control of Veblen West.

When a debtor "fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *Savino*, 99 B.R. at 526. This includes an obligation to file accurate records and bankruptcy schedules. *See In re Oklahoma Refining Co.*, 838 F.2d at 1136 ("It is also established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee."); *Ford*, 36 B.R. 501, 504 (Bankr. W.D.Ky 1983) ("Inherent in debtor's fiduciary obligations under the Code is the duty to file accurate financial reports disclosing all transactions involving estate assets.... Any failure to file accurate financial statements is an omission contributing to cause for appointment of a trustee."). In *Tradex Corp. v. Morse*, for instance, a trustee was appointed when the debtor had failed to provide accurate schedules and other supporting documents/financial data in timely fashion and, even when those materials were finally provided, failed to provide information that was trustworthy. 339 B.R. at 833. In *In re Plaza De Retiro, Inc.*, the court appointed a trustee in part for concerns about the accuracy of debtor's schedules, and about the failure of the debtor's principal to explain matters sufficiently at the § 341 meeting. 417 B.R. 632, 641-42 (Bankr. D.N.M. 2009).

Veblen West is not a small family farm; it is a large, multi-faceted, sophisticated dairy operation. It has an experienced management company (PRM), run by an experienced dairyman, Millner. It has a Controller, and utilizes the services of an independent CPA firm highly-experienced with dairy operations. (May 25, 2010, Transcript at pages 24-25). Veblen West is highly computerized, uses specialized dairy accounting software, has a team of bookkeepers, and

45

employs the services of an IT consultant and other individuals to assist with financial recordkeeping. (*Id.* at pages 28-30, 35-37; May 10, 2010, Transcript at page 98, Millner Transcript at 12). Veblen West also, at the time of filing, enjoyed the representation of an experienced lead bankruptcy counsel commanding $460 per hour (Doc. 17 at page 7), who was directing a cadre of highly-compensated reorganization attorneys and paralegals from one of the Twin Cities' largest firms. (*Id.*) All of the foregoing dictates that Veblen West's Schedules and Statement of Affairs should have been accurate and reliable in the first instance. The timing of Veblen West's amendment to its Schedules and Statement of Affairs is transparent and suspect. The amendments seek to avoid the consequences of Millner's self dealing, insider preferences and fraudulent conveyances, and the explicit language of 11 U.S.C. § 552(b).

When Veblen West filed its Summary of Schedules and Statement of Affairs (Exhibit AG11), it represented that it had $15,530,747.83 in assets and $23,780,312.31 in liabilities (*Id.*, at page 1). Simple math dictates Veblen West had a negative net worth by well over $8 million. During the first day of the hearing on AgStar's motion to appoint a trustee, AgStar introduced compelling evidence, described elsewhere in this brief, disclosing a myriad of insider preferential transfers and fraudulent conveyances that Millner/PRM had engineered. The evidence was so overwhelming that, when Veblen West orally moved to dismiss AgStar's motion at the conclusion of AgStar's case, the Court stated that AgStar had met its burden of production, and that it would "have a difficult time" not ruling in AgStar's favor in the absence of rebuttal evidence from Veblen West. (May 10, 2010, Hearing Transcript, at page 199).

On the day before the hearing on AgStar's motion resumed, Veblen West filed an Amendment of Schedules A, B, D, E, F, G, H and Amendment of Statement of Affairs with Exhibits. (Doc. 208.) In stark contrast to the dire financial picture painted by Veblen West in its original filings, these amended schedules portrayed a completely different story. Veblen West

increased the value of its real estate holdings in its schedules by approximately $14.1 million, and, despite also increasing its unsecured claims from $5.1 million to $6.7 million, suddenly claimed a positive net worth of approximately $3 million!  (*Id.*).

The accurate disclosure of assets and liabilities is critical in a Chapter 11 case.  In a Chapter 11, whether the debtor has a positive or negative net worth after accounting for all assets and liabilities has significant consequences.  A positive net worth exposes the debtor to potential payment of attorneys' fees, post-petition interest, and full payment of all unsecured claims with interest.  A negative net worth provides certain advantages and disadvantages including, as in this case, the pressing need to pursue insider preferential transfers and fraudulent conveyances.  Even a moderately-competent bankruptcy attorney, let alone a sophisticated team of highly-paid bankruptcy professionals from a prestigious law firm, would recognize the ramifications inherent in a positive versus a negative net worth.

Nevertheless, Veblen West would have this Court believe that despite its skilled CPAs, controller, specialized accounting software, bookkeeping staff, management know-how, and highly-compensated bankruptcy counsel, Veblen West committed millions of dollars in mere "oversights" when it initially completed its schedules and statement of affairs.  Given that Veblen West made these amendments on the eve of the second day of the hearing on AgStar's motion, after AgStar had presented compelling evidence regarding Millner's self dealing, insider preferential transfers, and fraudulent conveyances, there is a much more plausible explanation—Veblen West realized that its Schedules and Statement of Affairs as originally filed left it vulnerable on two major fronts.  The amendments are a belated, transparent, and disingenuous

effort to avoid the consequences of these issues, and are based on litigation strategy, not reality or honesty.[30]

First, there is the 11 U.S.C. § 552(b) issue to be resolved regarding Veblen West's request to use cash collateral. Both in response to Veblen West's motion to use cash collateral, and in support of its motion to appoint a Chapter 11 Trustee, AgStar has emphasized that under 11 U.S.C. § 552(b), Veblen West cannot provide adequate protection by providing replacement liens in milk. Veblen West would like to avoid this problem by claiming AgStar is nevertheless adequately protected because of its newly-claimed equity cushion in other collateral, a claim it could not have made if it had not radically altered the valuations reflected in its Schedules.

Second, and more importantly with regard to the motion to appoint trustee, after the first day of testimony on this motion, and after the Court's acknowledgement of the strength of AgStar's case, Veblen West recognized the problems presented by the preferential and fraudulent insider transactions that were the hallmark of Rick Millner's financial mismanagement. Veblen West hopes to avoid the consequences of Millner's self-serving conduct by claiming that Veblen West is not insolvent, but instead has a positive net worth. Millner and Veblen West, and their experienced bankruptcy counsel, understand that if they claim Veblen West was solvent over the years prior to filing, they can then claim that a key element of preferential transfers and fraudulent transfers under 11 U.S.C. § 547(b)(3) and 11 U.S.C. § 548(a)(1)(B)(ii)(I), will not be satisfied. Moreover, it is likely that Veblen West will argue that there is no need to spend the time, money, and other resources pursuing the fraudulent

---

[30] For instance, Debtor, its sophisticated management, and counsel, Leonard, Street, and Deinard, had the time to carefully and accurately orchestrate the February 22, 2010, eve-of-bankruptcy assignments of approximately $6 million in debt out of Veblen East to Debtor and Vantage, as described above, to preserve insider debt, and deprive Veblen East of capital at a time when its finances were in critical condition. These same sophisticated individuals and entities should have had the time to get Debtor's Schedules and Statement of Affairs right in the first instance.

48

conveyance and insider preference claims, because it intends to confirm a 100% payment plan in any event.

There are three key problems with this position. First, it is offensive on its face. It is inconceivable that Veblen West, with its considerable management resources, able accountants, and high-powered attorneys made the egregious miscalculations here inadvertently or innocently. Second, just as Veblen West's suggestion that Michael Wyum will provide independent management insight is an insult to the Court, so too is Veblen West's belated claim that it is suddenly solvent. It is no secret that the dairy industry has been experiencing severe financial trauma. Millner's testimony on this issue has been uncontested.[31] Dairies are, as a result, selling at 40-60% of their debt load. The newfound equity in this debtor estate is a ruse concocted to avoid the consequences of Millner's self-dealing, insider preferences, and fraudulent conveyances, and to avert the consequences of a loss on the 552(b) issue. If Veblen West loses on the 552(b) issue and has no equity in which to give a replacement lien, then cash collateral usage will terminate, and the reorganization will grind to a halt.

Third, Millner and Veblen West hope to play this "payment in full" scenario out without any risk to them but with considerable risk to the creditors. The first payments to unsecured creditors under any confirmed plan will likely not occur until two years after Veblen West's petition of April 2010, and by then it will be too late to do anything about Millner's/PRM's preferential and fraudulent transfers because the statute of limitations on avoidance actions will have expired.[32]

---

[31] When asked whether he agreed if "the dairy industry is stressed right now" Millner said "yes", and further acknowledged, when asked if that had negatively impacted the sale price of dairies and their assets, that it "would be a logical answer that if it's stressed, that prices are going to be depressed." (May 25, 2010, Millner Transcript, at pages 65-66.)

[32]     11 U.S.C. § 546 provides:
(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
(1) the later of—

Veblen West's case cannot be involuntarily converted to Chapter 7 when its confirmed plan fails. 11 U.S.C. § 1112(c). It can only be dismissed. Consequently, when Veblen West's promise of a payment in full plan fails, the only option will be dismissal, which will terminate the ability of any party to pursue preferential transfer or fraudulent conveyance claims. 11 U.S.C. § 546(a)(2). In short, Millner's and Veblen West's sudden claim that there has been an $11 million swing in the net worth of the estate is a blatant and transparent attempt to eliminate the Court's concerns about adequate protection for use of cash collateral and the myriad preferential and fraudulent transfers.

Veblen West's self-serving amendments to its Schedules and Statement of Affairs do not end with the miraculous rise in Veblen West's net worth. There are other amendments and changes that are equally incredible, including:

- Veblen West failed to list its management contract with PRM and its calving contract with Veblen East, in its initial schedules. (May 10, 2010, Hearing Transcript, at pages 79-80);

- In the original Schedules Veblen West understated its milk accounts receivable from Bonard's Creamery by 50% or about $320,000. (Doc. 208);

- Veblen West completely omitted about $109,000 in accounts receivable. (*Id.*);

- Veblen West completely omitted a secured claim for nearly $870,000 by Rural Electric Economic Development. (*Id.*);

- Veblen West understated the claim of an insider, Cliff Viessman, Inc., by about $465,000. (*Id.);*

- Veblen West understated the claims of insiders Mark Wyum, Michael Wyum, Steven Wyum, and Pherson Farms by approximately $50,000, $100,000, $50,000 and $40,000 respectively. (*Id.*);

---

(A) 2 years after the entry of the order for relief; or
(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
(2) the time the case is closed or dismissed.

- Veblen West completely omitted about $600,000 in unsecured claims, including the claims of insiders R&W Heifers ("W" for Wayne Viessman and "R" for Rick Millner) for about $370,000, and Jason Medhaug, in the amount of $13,000. (*Id.*);

- Veblen West failed to identify about $700,000 worth of property owned by another, but held in its possession in the form of feed owned by Veblen East retained at Veblen West's facility. (*Id.*; *see also* May 10, 2010, Hearing Transcript, at page 86);

- On the date of filing, Veblen West had milk inventory in storage tanks awaiting pickup and in transit. Veblen West, however, did not list any milk inventory, even in its Amended Schedules and Statement of Affairs.

- Veblen West failed to list significant payments to Vantage, as detailed above, in its original schedules and statement of affairs. (Exhibit AG11, Exhibits 3B & 3C to Statement of Financial Affairs).

Veblen West, through Millner, is playing fast and loose with the Court and the estate's creditors. The timing and the significance of the amendments to Veblen West's Schedules and Statement of Affairs are sufficient in themselves to justify the appointment of an independent trustee.

## C.  Veblen West's Witnesses Were Not Compelling.

Veblen West had a number of fact witnesses, other than Millner and Wyum, testify in response to AgStar's case, but those witnesses all had demonstrable biases in favor of Veblen West and lacked knowledge regarding the crux of AgStar's claims. Arnold Gruenus, Don Larson, Ian Wood, and Michael Stavick all demonstrated two shared characteristics. First, not one of them testified regarding Rick Millner's self-dealing, insider preferential transfers, or fraudulent conveyances, which are the critical financial-management issues that AgStar identified. (*See, e.g.,* May 10, 2010, Hearing Transcript, at page 239.) Second, other than testifying about the wet weather conditions in the Veblen, South Dakota, area in recent years, none of them had any knowledge regarding Millner's/PRM's struggles in complying with non-weather-related regulations of Minnesota, North Dakota, or South Dakota, or regarding a dairy

51

under Millner's management being shut down because it was a public health hazard. In addition, Stavick retains part ownership in Veblen West's related entities, DD-TRF, Veblen East, and DD-Milnor, and has guaranteed those entities' debts as well. (Exhibits AG1 and AG2.) Gruenus' entity is being paid to pump the lagoons at Veblen East and Veblen West, his biggest customers (May 10, 2010, Hearing Transcript, at pages 202-03). Larson was paid in full prior to the bankruptcy. (*Id.*, at page 230). Wood's employer, Cargill, similarly shares the distinction of being an unsecured creditor that was favored with significant payment in the weeks and months leading up to the filing of Veblen West's petition. (Doc. 91 at 13, Doc. 208-1 at 14). Consequently, all of these witnesses ignored the critical facts and legal issues before the court, and had ample motivation to offer biased testimony in support of Millner.

**D.    Joel Gratz's testimony did not save the day for Millner.**

Veblen West also called Joel Gratz, an accountant with Christianson & Associates (Christianson) out of Willmar, for the purpose of justifying some of the transfers summarized above. Christianson had been retained by PRM to assist PRM with its month-end close-outs, and reconciliations. (May 25, 2010, Hearing Transcript, at page 28). Christianson has never audited any of the entities' books or records. (*Id.*, page 29). It conducted a financial review for year-end 2008. (*Id.*) Christianson conducted month-end reconciliations through June, 2009, and then stopped and has not completed a month-end reconciliation since then. (*Id.*, page 30). Christianson does not provide any management support nor does it make any decisions as to what particular transactions are paid or not. "We are simply there to – if a transaction occurred was it properly recorded in the proper entity at the proper time." (*Id.*, page 31). Christianson also prepared the tax returns for the entities for 2008 and 2009. (*Id.*, page 33). Christianson had nothing to do with the preparation or review of the February 22nd Assignments. (*Id.*, page 54).

Mr. Gratz "explained" that negative account balances in Veblen West's QuickBooks account for Choice Financial and First Savings may not reflect negative accounts on the bank records because PRM "maybe bank it on the float to some extent, which is not nearly as large as it used to be, but there might be a day or two." (*Id.*, page 53). He claimed that "playing the float for a day or two" is "common out there in the world of business." (*Id.*)

Mr. Gratz's testimony reflected a fundamental misunderstanding of the current operations of the Dairies and the transactions at issue. As to the February 22nd Assignments, he claimed that "Vantage became the financing arm, that these dairies had no financing left and/or cash available and to pay some bills to continue operating. And my understanding is that Vantage took on some of these, if not all of these, respective old accounts payable due from, due to's." (*Id.*, pages 54-55). This makes no sense, insofar as Vantage never financed any entity whatsoever, and in fact, was the beneficiary of at least $1.2 Million in cash from Veblen West and DD-Milnor in the month of March, 2010 alone.

Mr. Gratz further claimed that Vantage would buy herd replacements directly from Veblen East, which is simply wrong. (*Id.*, pages 76-77). He believed Vantage was created in response to Veblen East's termination of its heifer contract with Vantage itself. (*Id.*) He claimed that the second lactation cows were going to Vantage from Veblen East, which is also simply wrong. (*Id.*, page 78).

Mr. Gratz acknowledged that he is and was not able to provide any testimony that any of the transactions summarized above were, in fact, in the ordinary course of business; his testimony was limited to the proposition that they could have been, and that the transactions were in fact entered into the PRM accounting software. (May 25, 2010, Hearing Transcript, at pages 72-73). He does not have sufficient information to say whether any of the entities are solvent or insolvent. (*Id.*, pages 73-74). Christianson has not been asked to conduct any type of fraud

investigation to determine whether any transactions constitute fraudulent conveyances or voidable preferences. (*Id.*, pages 74-75).

## V. CONCLUSION

The evidence AgStar has presented is both compelling and overwhelming. Cause for the appointment of a Chapter 11 trustee has been shown under § 1104(a)(1). In the alternative, the above-described facts establish that the Court should exercise its discretion under § 1104(a)(2) to appoint a trustee. For the foregoing reasons, AgStar respectfully requests that this Court grant its motion for appointment of an operating trustee for Veblen West pursuant to 11 U.S.C. § 1104(a)(1) & (a)(2).

Dated this 9th day of June, 2010.

/s/ ROGER W. DAMGAARD
Roger W. Damgaard
        Roger.Damgaard@woodsfuller.com
WOODS, FULLER, SCHULTZ
& SMITH, P.C.
P.O. Box 5027
Sioux Falls, SD  57117-5027
Telephone:  (605) 336-3890


Gary W. Koch
        gkoch@gislason.com
Dustan J. Cross
        dcross@gislason.com
GISLASON & HUNTER LLP
2700 S. Broadway
P.O. Box 458
New Ulm, MN  56073
Telephone:  (507) 354-3111